1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                        EASTERN DISTRICT OF CALIFORNIA

9

10   RICHARD MIGUEL GARCIA,          Case No. 1:14-cv-00980-DAD-MJS (HC)

11              Petitioner,          **FINDINGS AND RECOMMENDATION TO**
                                     **DENY FIRST AMENDED PETITION FOR**
12        v.                         **WRIT OF HABEAS CORPUS**

13   STUART SHERMAN, Warden          **(ECF No. 22)**

14              Respondent.

15

16

17

18        Petitioner is a state prisoner proceeding pro se with a first amended petition for

19   writ of habeas corpus under 28 U.S.C. § 2254. Stuart Sherman, Warden of California

20   Substance Abuse Treatment Facility, is hereby substituted as the proper named

21   respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Respondent

22   is represented by Jeffrey White of the Office of the California Attorney General.

23        The petition raises the following claims: (1) the trial court erred in failing to instruct

24   the jury on the lesser offenses of voluntary and involuntary manslaughter; (2) the trial

25   court gave erroneous instructions on the gang enhancement; (3) the instruction on

26   aiding and abetting was erroneous; (4) there was insufficient evidence to support a

27   conviction for aiding and abetting murder; (5) the trial court erroneously failed to stay a

1   firearm enhancement; and (6) Petitioner was sentenced under the incorrect Penal Code

2   provision for the gang enhancement. (ECF No. 22.)

3        As discussed below, the undersigned recommends the petition be denied.

4   **I.    Procedural History**

5        Petitioner is currently in the custody of the California Department of Corrections

6   and Rehabilitation pursuant to a judgment of the Superior Court of California, County of

7   Tulare convicting him of second degree murder with gang and firearm enhancements.

8        Petitioner initially was convicted by a jury of conspiracy to commit murder and

9   second degree murder, with gang and firearm enhancements. He received an aggregate

10  sentence of fifty years to life. People v. Garcia, No. F062834, 2013 WL 3286207, at *1

11  (Cal. Ct. App. June 27, 2013) (Lodged Doc. 4.) Petitioner appealed. (Lodged Doc. 1.)

12       On June 27, 2013, the California Court of Appeal for the Fifth Appellate District

13  reversed on the conspiracy count and remanded for a determination of whether

14  Petitioner would be retried. (Lodged Doc. 4.) The court directed that, if Petitioner was not

15  retried, the trial court would strike the conviction and sentence for the conspiracy count

16  and amend the abstract of judgment to reflect that Petitioner was sentenced to 15 years

17  to life for second degree murder, plus 25 years to life for the firearm enhancement, for an

18  aggregate term of 40 years to life. (Lodged Doc. 4 at 52.) On October 16, 2013, the

19  California Supreme Court denied Petitioner's petition for review. (Lodged Docs. 5-6.)

20       The state determined not to retry Petitioner on Count 1; he was resentenced on

21  Count 2 to an indeterminate term of fifteen years to life, plus 25 years to life for the

22  firearm enhancement, for an aggregate term of 40 years to life. (Lodged Doc. 11.)

23  Following resentencing, Petitioner again appealed. (Lodged Doc. 7.)

24       On June 23, 2014, while his appeal was pending, Petitioner filed his first petition

25  for writ of habeas corpus along with a request to stay the proceedings pending resolution

26  of his second appeal. (ECF Nos. 1, 3.) His motion to stay and abey was granted. (ECF

27  No. 9.)

28                                          2

On December 22, 2015, the Fifth District Court of Appeal modified the abstract of judgment to reflect the correct gang enhancement and to note that the enhancement was stayed. (Lodged Doc. 11.) In all other respects the judgment was affirmed. On February 24, 2016, the California Supreme Court denied review. (Lodged Docs. 12-13.)

Thereafter, the stay in this court was vacated. (ECF No. 21.) Petitioner filed the first amended petition presently before the Court. (ECF No. 22.) On May 3, 2017, Respondent filed an answer. (ECF No. 36.) On July 19, 2017, Petitioner filed a traverse. (ECF No. 39.) On December 7, 2017, Petitioner filed a document styled as a "Points and Authorities in Support of Traverse." (ECF No. 42.) The matter is submitted.

## II.  Factual Background

The following facts regarding the underlying offense are taken from the Fifth District Court of Appeal's June 27, 2013, opinion and are presumed correct. 28 U.S.C. § 2254(e)(1).

> On the evening of August 28, 2009, two men wearing blue were walking along Avenue 416 in Orosi. There were three other people on the street who were not involved in the shooting, but witnessed the following events.
>
> As the two men in blue walked on the street, a green Honda Accord appeared and pulled up to where the two men were walking. There were four men in the Honda. Someone in the car yelled the word "'SuRat'" at the two men in blue.
>
> One witness [J.R.] testified that the Honda's driver and the man who was sitting in the front passenger seat got out of the car. They threw cans at the two men in blue. [FN2]
>
> > [FN2: On cross-examination, this witness was impeached with his prior statement to the deputies that the man in the front passenger seat, later identified as defendant, did not get out of the car.]
>
> This same witness testified that the man sitting in the Honda's back seat, behind the driver, got out of the car and was holding a gun. The gunman initially aimed the gun at the witness, but then realized the witness was not with the two men in blue. The gunman then turned the weapon at the two men in blue, and fired five or six shots. One of the men fell

3

down. The other man appeared to be hit in the leg, but he was able to escape.

Another witness [G.C.] testified that the gunman got out of the Honda's back seat, and the other three men did not get out of the car or open their doors. The gunman fired five or six shots, one man fell down, and the second man ran away. After firing the shots, the gunman got back into the car, and the Honda left the area at a high rate of speed.

### The initial investigation

Around 7:50 p.m., deputies from the Tulare County Sheriff's Department received a dispatch about a gunshot victim on Avenue 416. The deputies found Arturo Bello lying on the road. Bello was dead, and his head was in a pool of blood. He had been wearing a blue tank top, a blue baseball cap, and white tennis shoes with a blue emblem. There were no weapons near him. There was a beer bottle found on the street in the victim's general vicinity.

### Apprehension of suspects

Shortly after the shooting, the deputies received the report that a dark colored Honda was involved. Just after finding the victim's body, the deputies saw a vehicle matching the Honda's description. It was traveling in excess of 75 miles per hour. The Honda passed two deputies traveling in an unmarked patrol unit. The deputies immediately activated the signal lights and siren to conduct a traffic stop. The Honda slowed down and finally stopped.

There were four people in the Honda. Josh Hernandez (Josh) was the driver. Defendant was sitting in the front passenger seat. Santos Hernandez (Santos), Josh's brother, and Rodney "Lance" Zayas were in the back seat. [FN3]

> [FN3: We will refer to Santos and Josh by their first names for ease of reference; no disrespect is intended.]

Josh was wearing a black baseball cap with a red letter "C," and had a red bandana hanging out of his back pocket. Josh had a tattoo on his arm in red ink which said "Hernandez de Catela."

Zayas had a .22–caliber live bullet in his pocket. Zayas also had "X4" and "TC" tattoos, which were gang-related. Santos

4

had a "C" tattoo on his arm, which stood for Catela. Defendant did not have any visible tattoos and was not wearing any red or gang-related attire when he was arrested.

At an in-field showup, one of the witnesses identified Zayas as the gunman, and said the three other suspects had been in the Honda.

### Search of the car

A Taurus nine-shot .22–caliber revolver was found on the floorboard of the Honda's backseat. It contained one .22–caliber live round but no expended shells. A plastic case was also in the backseat, and it contained a single .22–caliber live round and a cylinder lock. The live rounds which were found in Zayas's pocket, the revolver, and the plastic case were the same brand.

There were two CD cases in the car marked with the words "NorCal" and other northern gang-related words. There were beer bottles in the car.

### Searches of the suspects' residences

The deputies searched defendant's bedroom in his mother's house and found a Blackberry cell phone with gang photographs; a school group photo which depicted one person throwing a "four" sign and had derogatory phrases about the southern gang written on it; and other papers with gang letters on them. Defendant shared the bedroom with his brother, and the cell phone belonged to his brother.

When the deputies searched Josh's house in Bakersfield, they found a coffee mug with a drawing of the Huelga bird, the words "Catela, BPC," drawings of the "smile now, cry later" masks, and it said: "'F* * * those who oppose.'" There was a photograph of Josh "throwing up" a "four" sign with a red rag, signifying the Norteno gang.

Detective Crystal Derington testified that "Brown Pride Catela" was a northern gang in Cutler, and the words on the mug were "basically calling out their rival saying that they'll take care of business and do what it takes to stand their ground and take control of their territory...."

Zayas's house in Orosi was searched, and the deputies found a .12–gauge Mossberg semiautomatic shotgun under the dresser in Zayas's bedroom. It contained five shotgun

shells. There was red clothing in Zayas's bedroom closet. The deputies also found three letters from jail inmates and a page of gang-rap lyrics.

### *The fatal gunshot wound*

The victim suffered two gunshot wounds. The fatal wound entered his upper lip, just below his nose. The bullet traveled front to back, slightly downward, and slightly right to left. It fractured the victim's teeth [FN4] on his upper jaw, continued through the airway in the back of the mouth, severed the brain stem from the spinal cord, and went through the base of the skull. There was a fragment exit wound on the back of his scalp. A small caliber bullet fragment with rifling marks was recovered from his neck. This bullet wound was "immediately" fatal.

> [FN4: Several teeth were found on the street near the victim's body.]

The victim had a second gunshot wound which entered the right side of his back. The bullet's trajectory was at an angle—slightly back to front, upward, and slightly left to right. The bullet hit the liver, entered the right chest cavity, and hit a rib. There was no exit wound. A deformed, small caliber bullet with rifling marks, and bullet fragments were recovered from the victim's body.

There were multiple abrasions on the victim's face and body. The victim's blood-alcohol level was 0.18 percent, and there was evidence that he had ingested marijuana.

### *Defendant's first statement*

At 7:32 a.m. on August 29, 2009, Detective Zaragoza conducted a videotaped interview with defendant. He advised defendant of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436 (Miranda), and defendant agreed to answer questions about the homicide. [FN5] Defendant, who was 23 years old, said Josh picked him up the previous day, and Zayas and Santos were in the car. Josh drove them to a cemetery, where they visited the grave of Josh's brother. They stayed there for about two hours and drank beer. Defendant said they left the cemetery in Josh's car. They were driving through Orosi when defendant fell asleep. Defendant said when he woke up, the deputies were behind Josh's car to conduct the traffic stop. Defendant said he did not know anything about a homicide, he did not do anything

6

wrong, and he fell asleep after they left the cemetery. At the end of the interview, Detective Zaragoza told defendant he was going to be booked into jail and asked if he claimed membership in a gang. Defendant said he was not involved in any gangs, and he could be housed in general population in the jail.

> [FN5: The videotapes of defendant's two interviews were played for the jury and not transcribed by the court reporter. The prosecution apparently prepared transcripts for the jury to review during trial, but the transcripts were not introduced into evidence or included in the record. Our summary is based on our review of the videotapes themselves, introduced as exhibit Nos. 69 and 70.]

While not depicted on the videotape, Detective Zaragoza testified that defendant was "dry heaving" into a waste basket for about 10 to 15 minutes at the beginning of the interview, but he was coherent and did not appear under the influence. The videotape reflects that defendant was calm and polite during the interview.

***Defendant's second statement***

Around 9:00 a.m. on the same day, defendant asked to speak to the detectives again, and said he had been too scared to tell the truth. Detective Zaragoza conducted another videotaped interview. Defendant was again advised of the Miranda warnings, and defendant said he wanted to talk to Zaragoza. Defendant was very calm and polite during the interview.

Defendant said he lied during the first interview to protect Zayas, and that Zayas fired the gun. Defendant said they left the cemetery in Josh's car. Josh was driving, defendant was in the front passenger seat, and Zayas and Santos were in the back seat.

Defendant said there were two men walking on the street, and they were wearing blue. Josh drove past them, then turned the car around and pulled up right next to them. Defendant said they did not yell at the men but "we all recognized them."

Detective Zaragoza asked defendant, "Who came up with the idea to go mobbing?" [FN6] Defendant replied: "Well, we all did but we never thought that that was going to happen."

7

Defendant said they had decided to have a barbeque, but first they were going to do a little mobbing. They were driving around and "one thing led to another."

> [FN6: As we will explain post, the prosecution's gang expert testified that "mobbing" meant "to get together" in a vehicle, look for a rival gang member, and take action against that person.]

On further questioning, defendant said that Zayas was the person who said they should go mobbing. Defendant said he never agreed to go mobbing but admitted that he remained in the car. Defendant said Zayas always had the gun, but defendant claimed he did not know about the gun before the shooting.

Detective Zaragoza asked defendant if going mobbing meant they were going to look for southerners. Defendant said, "Not necessarily," and that it could mean that they were going to look for someone or just drive around and cruise. Defendant denied that the Surenos were their targets.

Defendant said Zayas started firing the gun. Defendant said no one else got out of the car. Defendant thought Zayas fired five or six shots. Defendant said everyone in the car was stunned that Zayas had a gun and fired the shots.

Defendant said that after Zayas finished shooting, Zayas got back in the car and said, "'[L]et's get the f* * * out of here,'" and "'I got 'em, I got 'em.'" Josh took off for Orosi, but the deputies stopped them.

Detective Zaragoza asked defendant if he was a Norteno. Defendant said no. Defendant said he lived in Cutler, that there were a lot of northerners, and some were his friends. Defendant said some people were gangbangers, and he "kicked it" with them, but claimed he was not in a gang.

Defendant said he "kicked it" with Santos, Josh, his brothers and cousins. Defendant knew Santos and Josh were northerners. Defendant was asked: "Do you kick it with northerners?" Defendant nodded his head, "[Y]es" Defendant was asked, "[W]hich clique?" Defendant said: "I was never in a clique. I just hung around with them."

Defendant said he hung around with Santos, Josh, and with "BPC." Defendant was asked, "[H]ow long you been kicking it

with them?" Defendant replied: "A long time ... seven or eight years."

"Q. So you kick it with the BPC, the northerners?

"A. Yeah."

Defendant was repeatedly asked if he knew Zayas had a gun before the shooting. Defendant eventually admitted that "we knew" Zayas had a gun before the shooting, because Zayas picked up the gun at his house. Defendant explained they left the cemetery and drove to Zayas's house. Zayas went into the house and then returned to Josh's car. Defendant said when Zayas got into the car, he showed them that he had a gun, and it was a chrome .22– or .25–caliber revolver. Defendant admitted he had seen Zayas with a gun on other occasions. Defendant said they carried guns to feel safe from the southerners.

Defendant repeatedly denied that he touched the gun. When asked if his fingerprints could be on the gun, defendant said they might be. Defendant then added there was a "big possibility" that he touched the gun, but he could not remember since he was drunk that night.

Defendant admitted that southerners had once shot at him. He knew that southerners had shot Josh a couple of times. Defendant also knew that Zayas's brother had been murdered by a southerner in a gang-related shooting.

As the interview continued, defendant was asked if anyone in the car said they should look for southerners. Defendant said that Zayas said, "'[H]ey, f* * *, let's go look for some scraps.'" Defendant said they "ran into those guys," and Zayas said they were "scraps." Defendant admitted that he said, "[F]* * * 'em" when he saw the two men on the street.

Defendant said Zayas got out of the car, fired the shots, got back into the car, and said, "'I got 'em, I got 'em.'" Defendant said Zayas meant he got the southerner he had shot. Josh and Santos said, "'[L]et's jam.'" Defendant said, "Let's get the f* * * out of here."

Defendant was asked what they talked about in the car before the traffic stop. Defendant said they were all "tripping out." Zayas was scared, and he wanted defendant to run away with the gun. Defendant said no because he didn't shoot the gun.

9

"Q. You've been a northerner for what, eight years ... ?

"A. Not anymore since today. F* * * that. I don't need this shit, man."

Defendant said he wanted "witness protection" and did not want to be involved with gangs.

### *PROCEDURAL HISTORY*

Defendant, Josh, Santos, and Zayas were jointly charged with count I, conspiracy to commit murder (§§ 182, subd. (a)(1) & 187); count II, first degree murder of Bello (§ 187, subd. (a)), with a special circumstance that the offense was committed by active participants in a criminal street gang (§ 190.2, subd. (a)(22)); and count III, attempted murder of the second man (§§ 664/187, subd. (a)). [FN7]

> [FN7: While defendant was charged with murder with a special circumstance, the prosecutor announced that she would not seek the death penalty.]

As to all counts, it was alleged that a principal personally and intentionally discharged a firearm which proximately caused death (§ 12022.53, subds.(d), (e)(1)); and the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). As to count II, murder, it was separately alleged that codefendant Zayas personally used a firearm (§ 12022.5, subd. (a)(1)).

Defendant pleaded not guilty. The court granted the prosecutor's motions to sever defendant's trial from the three codefendants, and to dismiss count III, attempted murder, against defendant.

After a separate jury trial, Zayas was found not guilty of first degree murder, and guilty of the lesser included offense of second degree murder with a firearm and gang enhancements. He was found not guilty of attempted murder. Zayas was sentenced to 40 years to life. (People v. Zayas (F062556) filed 6/21/2012)

Santos pleaded no contest to voluntary manslaughter and the gang enhancement, with an indicated sentence of 16 to 21 years in prison. The record is silent as to the disposition of the charges against Josh.

Defendant was tried separately for count I, conspiracy to commit murder, and count II, first degree murder with a

10

special circumstance, and the special allegations. Santos testified for the prosecution at defendant's jury trial. Santos stated that he was concerned for his safety and considered a "rat" by the Nortenos because he was testifying against defendant.

### SANTOS'S TRIAL TESTIMONY

Santos testified that he had been a member of the North Side Cutler Norteno gang, but he was no longer in a gang. The Nortenos lived in Cutler while the Surenos, their rivals, lived in Orosi. Santos had an "X–4" tattoo on his arm which meant 14, the number claimed by the Nortenos.

Santos testified he did not know if his brother, Josh, had also been a member of the Nortenos, but admitted that Josh hung out with him, and he was involved with the Nortenos. Santos and Josh had been shot at on previous occasions by members of the Sureno gang. Santos testified that Zayas was also a member of the Nortenos.

Santos had known defendant for 10 years. They worked together and frequently drank and went to parties together. Santos did not know if defendant was involved with a gang. Santos did not talk about his own gang status with defendant, but "everybody knew that I was" in the gang.

### The cemetery

Santos testified that on the morning of August 28, 2009, he and his wife went to the cemetery in Sultana to visit the grave of his younger brother, who had died in a car accident. Josh arrived separately in his Honda. Santos's wife left, and Santos and Josh remained at the cemetery. Santos and Josh drank beer and cried about their brother.

While Santos was at the cemetery, he received a call from Zayas. Santos told Zayas where they were. Around 1:00 p.m., Zayas arrived at the cemetery. Zayas's older brother was also buried there. Santos knew that Zayas's brother had been shot and killed by South Siders.

Santos testified they called defendant while they were still at the cemetery, because they wanted to arrange a barbeque. They left the cemetery, drove to defendant's house, and picked him up. They bought more beer, and then returned to the cemetery.

11

Santos testified the four men stayed at the cemetery and drank beer. Zayas was angry and upset as he thought about his brother.

### Zayas retrieves the gun

Santos testified that around 6:00 p.m., they left the cemetery in Josh's Honda. Josh was driving, defendant was in the front seat, and Santos and Zayas were in the back seat.

Josh drove the group to Zayas's house in Orosi so Zayas could get some money for food. Zayas went into the house while the other men stayed in the car and continued to drink.

Santos testified that when Zayas returned to the car, he had a revolver in his waistband. Santos was surprised to see the gun. Josh briefly took the gun from Zayas to make sure it was not loaded. Santos and defendant did not hold the gun.

Santos testified that Zayas said, "'Let's go for a ride,'" and used the term "mobbing." Santos believed that Zayas was "mad, looking for trouble" with South Siders. Santos knew the term "Scrap hunting" meant mobbing with a gun. Santos testified that everyone in the car knew Zayas had a gun. Santos thought Zayas was just looking for a fight. Santos testified none of them tried to get out of the car. Josh continued driving, and they all agreed to drive to Orosi to go mobbing.

### The shooting

Santos testified they drove around Orosi looking for Scraps. Zayas saw "two guys" wearing blue hats who were walking on Avenue 416. Josh drove past the two men and Zayas yelled something at them. Defendant swore at the two men. The two men yelled something back, and they threw something at Zayas.

Santos testified Josh turned the car around and drove up to the two men. Zayas got out of the car and fired shots at them. Santos testified it happened very quickly. Santos, Josh, and defendant stayed in the car. Zayas fired five or six rounds. Santos could not tell if he hit anyone.

Zayas got back into the car and said, "'I think I got one.'" Santos testified that he had no idea that Zayas was going to shoot anyone. Josh and defendant were shocked about what

Zayas did. Santos testified that Zayas shot a Sureno because he was mad that a Sureno killed his brother.

Josh immediately drove away from Orosi. No one in the car said anything. The deputies pursued them. When the deputies appeared behind their car, Zayas looked scared and told defendant to take the gun and run away. Defendant refused and Josh stopped the car.

Santos testified that after he was arrested, he was placed in a patrol car with defendant. Santos told defendant that he was going to claim he was drunk. Defendant did not say anything. Santos testified that when he was initially interviewed, he claimed he was drunk and passed out. However, he later told the detectives what happened in the car.

### *GANG EXPERT'S TESTIMONY*

Tulare County Sheriff's Detective Steven Sanchez was assigned the North County Gang Violence Special Unit. He testified the Norteno gang claimed the color red and the number 14. The letters "TC" were a local Norteno tattoo which meant Tulare County. Other Norteno tattoos included "X4" for 14, and the Huelga bird.

The Norteno subset gangs in Tulare County included the Brown Pride Catela (BPC), North Side Catela, and East Side Orosi. [FN8] There were over 150 Norteno gang members in the Cutler–Orosi area. The primary activities of the Norteno gang included homicide, attempted homicide, robbery, carjacking, and felony graffiti. One of the goals of the gang was to instill fear of retaliation.

> [FN8: Another officer testified that Brown Pride Catela was the predominant Norteno gang in the area.]

The Surenos were the rivals of the Nortenos and claimed the color blue and the number 13. A derogatory name for the Surenos was Scraps.

Detective Sanchez testified that gang members gain respect by being feared in the community. When they are disrespected, they will be seen as weak unless they respond. They could be disrespected by rival gang members yelling their names or tagging graffiti in their turf. Gang members will typically commit offenses in front of fellow gang members. They will achieve greater status within their gang if they

commit violent crimes. It is a sign of betrayal for a gang member to testify against another gang member.

### *"Mobbing"*

Detective Sanchez testified there was a Norteno turf war in the Cutler–Orosi area. Surenos claimed Orosi while Nortenos claimed Cutler, and the two towns were separated by one street. The violence between the two gangs had escalated within the past five years because each gang was trying to claim the other city as their turf.

Sanchez explained that "mobbing" meant "to get together" in a vehicle, look for a rival gang member, and take action against that person. It was common for gang members to go mobbing and look for their rivals. Detective Sanchez did not know if it was common for gang members to have a weapon while they were mobbing. "Scrap hunting" meant that a Norteno was looking for a rival Sureno.

### *Predicate offenses*

Detective Sanchez testified about two predicate offenses involving members of the Norteno gang in Tulare County. Robert Clevenger and Enrique Gonzalez, members of BPC, were convicted of committing an assault with a deadly weapon in May 2007. They were driving around in the Orosi area, confronted two Surenos, and Gonzalez opened fire on the Surenos. The participants in the other predicate offense were Javier Sahagun, Humberto Melchor, and George Lua, also members of BPC, who were convicted of committing an assault with a deadly weapon in October 2008. They had been in a car which opened fire on a Sureno in Cutler.

### *Gang status*

Detective Sanchez testified that in order to validate a person as a gang member, law enforcement officers rely on certain criteria. Based on such criteria, Zayas was a validated member of the Norteno gang: he had previously associated himself with the Nortenos when he was booked into jail, he had gang-related tattoos, and gang-related items were found at his house. Josh was also a validated Norteno and member of BPC. Josh often associated with Zayas. Josh was wearing Norteno clothing and colors when he was stopped after the shooting, he had gang-related tattoos, and gang indicia was found at his house. Santos was a validated gang member and admitted being a member of North Side Catela.

Detective Sanchez testified that defendant did not possess any gang indicia when he was arrested in this case. The officers did not find any weapons or gang-related attire when they searched defendant's house. Defendant has a tattoo of his last name on his leg. It was common for gang subjects to have such tattoos, but Sanchez conceded it was not a gang-related tattoo.

Detective Sanchez conceded that as of the day before the homicide in this case, defendant did not meet any of the criteria used to validate a person as a gang member. He was unable to locate any field interview or crime reports about defendant.

However, Sanchez testified that someone could be validated as a gang member by meeting the gang criteria based on one actual crime committed by that person. Sanchez believed defendant was a validated Norteno and part of BPC as of the date of the shooting because he admitted gang membership during his interview with Detective Zaragoza; he associated with gang members; he was involved in a gang-related crime; and he possessed gang indicia, gang writings, and gang photographs at his house.

When defendant was booked in this case, defendant said he did not have any known enemies. However, the intake officer who interviewed defendant reported that defendant said he was a Norteno dropout, and had known enemies in custody from both southern and northern sides.

Detective Sanchez testified that when defendant was interviewed by the officers about the homicide, he admitted that he had been associated with BPC for approximately eight years. He never claimed to be a dropout. Defendant also admitted that he "kicked it" with "'these guys,'" identified as Santos, Josh, and their cousins. Defendant told the detectives that Zayas picked up the gun from his house, that it was Zayas's idea to go mobbing, and defendant knew they were going to go out and "look for some Scraps." Defendant said that he saw the two men walking down the street, and he thought they were Surenos. Defendant admitted that he said, "'[F]* * * 'em.'" Detective Sanchez testified such a phrase meant to assault the rivals.

Sanchez testified the items found in defendant's bedroom were also indicative of Norteno gang membership, including the photograph with "BPC" written on it, along with the words, "'gang that all his Scraps belong 6 feet under.'" Some of the

15

people in the photograph were "X-ed" out in blue ink. Sanchez testified it was common to find yearbooks which belonged to gang members, where they had crossed out the pictures of rival gang members. Sanchez admitted that he did not know if defendant wrote the gang language on the photograph. The Blackberrry cell phone, which belonged to defendant's brother, contained a photograph that depicted defendant with six individuals, posing with a marijuana plant. Some of the subjects were flashing Norteno gang signs. However, defendant was not flashing a gang sign.

### Hypothetical question

The prosecutor asked Detective Sanchez a hypothetical question about four Nortenos who visit the cemetery and talk about a relative who was killed by a Surenos. They decide to go mobbing, and the surviving relative picks up his gun. They drive around and see two guys wearing Sureno blue. The Nortenos shout out gang slurs, the two guys in blue yell something in return. The driver makes a U-turn and pulls up to where the two guys are walking. The gunman shoots at both men in blue, and he kills one of them.

In response, Detective Sanchez testified that such a high-profile assault would be committed for the gang's benefit, and boost the gang members' status within the gang. "Also, it continues the war on the streets between the North and South, especially in the Cutler–Orosi area[,]" and this one incident would "fuel ten other incidents that happen in the future because of this. It's going to continue the gang war. It also sends a message to the rivals that one gang is particularly responsible for doing the shooting."

### DEFENSE EVIDENCE

Scott LaFleur had been defendant's high school English teacher in the late 1990s. LaFleur described defendant as a great kid, and he was shocked to hear about the charges against him.

Manuel Lopez lived next to defendant in Cutler and had known him for 15 years. Lopez described defendant as a quiet person who was not violent. Lopez was also surprised when he heard about this case. Lopez never knew defendant to be involved with gangs.

16

### *Defendant's trial testimony*

Defendant testified that he hung around with Josh and Santos. He knew they were Nortenos, but testified that they had a social relationship. On the day of the shooting, they picked him up and drove to the cemetery where they drank beer and smoked marijuana. Defendant said he did not know Zayas's brother, but knew he had been shot by rival gang members.

Defendant testified that they drove to Zayas's house to pick up money for a barbeque. Zayas returned to the car and showed them a gun. Josh took the gun away from Zayas to make sure it was not loaded. Defendant became concerned and asked Josh to take him home. However, defendant did not try to leave.

Defendant testified that "mobbing" meant drinking, smoking weed, and driving slowly. He admitted that mobbing could lead to trouble. Defendant saw the two men in blue walking down the street. Defendant pretended not to see them, but Zayas started yelling and exchanging words with them. Defendant told Josh to keep driving, but he did not tell Josh to pull over and let him out.

Defendant testified Josh turned around and drove up to the two men. Zayas got out of the car and started shooting. Defendant never thought Zayas would shoot anyone, and he was shocked when Zayas opened fire. After the shooting, defendant said, "'Let's get the f* * * out of here[,]'" because he had nothing to do with it. Defendant did not want to wait for the police to arrive, because he was afraid that Zayas might believe he was a "rat" and kill him too.

Defendant testified that he was not completely honest when he was initially interviewed in this case. He was shocked, sick, and afraid, and he was trying to protect Zayas. Defendant felt scared and pressured by the gang investigators. Defendant decided to ask for the second interview to clear things up.

Defendant admitted that he lied during his interviews with the officers. During one of the interviews, he said that he might have touched the gun in the car. He only said that because he felt pressured by the officers. Defendant testified that he never touched the gun. Defendant admitted that he also told the officers that he said, "'[F]* * * em,'" when he saw the two

17

> men walking on the street. However, defendant testified he never actually said that when he was in the car.
>
> Defendant knew Josh, Santos, and Zayas were Nortenos, and he got into the car that day with three known Nortenos. Defendant admitted that he said he "kicked it" with Josh and Santos, but he never said he was a Norteno or in BPC, and he had never been in a gang.
>
> Defendant testified the school photograph found in his bedroom belonged to a friend, and someone else wrote on the picture. Defendant claimed that the officers "labeled" him as a Norteno dropout.
>
> ### *Verdicts and sentence*
>
> Defendant was convicted of count I, conspiracy to commit murder. In count II, he was found not guilty of first degree murder, but guilty of second degree murder as a lesser included offense. The jury found the firearm and gang enhancements true. He was sentenced to 50 years to life.

People v. Garcia, No. F062834, 2013 WL 3286207, at *1–10 (Cal. Ct. App. June 27, 2013)

## III.    Jurisdiction and Venue

Relief by way of a writ of habeas corpus extends to a prisoner under a judgment of a state court if the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered a violation of his rights as guaranteed by the U.S. Constitution. Petitioner was convicted and sentenced in this district. 28 U.S.C. § 2241(d); 2254(a). The Court concludes that it has jurisdiction over the action and that venue is proper.

## IV.    Applicable Law

The petition was filed after April 24, 1996 and is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, federal

habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## A. Standard of Review

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter 562 U.S. 86, 101 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state

19

court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

### B. Requirement of Prejudicial Error

In general, habeas relief may only be granted if the constitutional error complained of was prejudicial. That is, it must have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require a showing of prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, claims alleging ineffective assistance of counsel are analyzed under the Strickland prejudice standard; courts do not engage in a separate analysis applying the Brecht standard. Strickland v. Washington, 466 U.S. 668 (1984); Avila v. Galaza, 297 F.3d 911, 918, n.7 (2002); Musalin v. Lamarque, 555 F.3d 830, 834 (9th Cir. 2009).

### C. Deference to State Court Decisions

"[S]tate courts are the principal forum for asserting constitutional challenges to state convictions," not merely a "preliminary step for a later federal habeas proceeding." Richter, 562 U.S. at 103. Whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what

arguments or theories supported or . . . could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Id. at 102. In other words:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 103. Thus, the Court may issue the writ only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. at 102.

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Thus, the court will "look through" a summary denial to the last reasoned decision of the state court. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Furthermore, the district court may review a habeas claim, even where the state court's reasoning is entirely unexplained. Richter, 562 U.S. at 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

**V.    Review of Petition**

   **A.    Claim One: Lesser Included Offense Instructions**

Petitioner argues that the trial court's failure to give instructions on the included offenses of voluntary and involuntary manslaughter violated his right to trial by jury and his right to due process as guaranteed by the United States Constitution.

21

**1.     Voluntary Manslaughter Instruction**

Petitioner contends that the trial court erred in failing to instruct the jury sua sponte on voluntary manslaughter based on the nonstatutory theory that a killing committed without malice during the course of an inherently dangerous assaultive felony constitutes voluntary manslaughter, rather than murder.

**a.     State Court Decision**

The California Supreme Court summarily denied this claim. Accordingly, the Court "looks through" the Supreme Court's decision to the reasoned decision of the Fifth District Court of Appeal. See Ylst, 501 U.S. at 804. The Court of Appeal rejected Petitioner's claim as follows:

> **IV. *Voluntary manslaughter instructions***
>
> Defendant was charged with first degree murder, and the jury received instructions on second degree murder as the only lesser included offense. Defendant now contends the court had a sua sponte duty to instruct the jury about both voluntary and involuntary manslaughter as lesser included offenses of second degree murder. In this section, we will address defendant's contentions about voluntary manslaughter.
>
> **A. *Sua sponte duty to instruct***
>
> "It is, of course, axiomatic that 'in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] ... That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citations], but not when there is no evidence that the offense was less than that charged.' [Citation.] Thus, it has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. [Citations.]" (People v. Kelly (1990) 51 Cal.3d 931, 958–959; People v. Breverman (1998) 19 Cal.4th 142, 154–155.)

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citation.] 'Such posttrial review focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]" (People v. Thomas (2012) 53 Cal.4th 771, 814, fn. omitted, italics in original.) [FN10]

> [FN10: This is a noncapital case for purposes of appellate review: defendant was charged with first degree murder with a special circumstance, but the prosecutor announced that she would not seek the death penalty, and defendant was ultimately convicted of second degree murder. (See, e.g., People v. Thomas, supra, 54 Cal.4th at p. 814, fn. 11.)]

**B. *Murder and manslaughter***

As explained above, murder is an unlawful killing with malice aforethought. (§ 187, subd. (a).) Malice is express when the defendant manifests a deliberate intention to take away the life of another. (People v. Blakeley (2000) 23 Cal.4th 82, 87, 96.) A defendant acts with implied malice when he acts with an awareness of endangering human life. (People v. Knoller (2007) 41 Cal.4th 139, 143, 153.)

Both voluntary and involuntary manslaughter are lesser included offenses of murder. (People v. Thomas, supra, 53 Cal.4th at p. 813; People v. Rios (2000) 23 Cal.4th 450, 460.) "The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. [Citation.]" (People v. Cook (2006) 39 Cal.4th 566, 596.)

Malice is presumptively absent, and the crime constitutes voluntary manslaughter, when a defendant, acting with intent to kill or conscious disregard for life, "kills 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), provided that provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from

passion rather than judgment. [Citation.] Additionally, when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of 'imperfect self-defense' applies to reduce the killing from murder to voluntary manslaughter. [Citations.]" (People v. Koontz (2002) 27 Cal.4th 1041, 1086.)

### C. *Garcia* and *Bryant*

As to voluntary manslaughter, defendant does not contend that lesser included offense instructions should have been given based on either heat of passion or unreasonable self defense. Instead, defendant asserts the trial court had a sua sponte duty to instruct the jury on a new, nonstatutory theory of voluntary manslaughter—a killing committed without malice during the course of an inherently dangerous assaultive felony—because the jury could have found that he did not know of or share Zayas's "murderous intent." Defendant contends that "California courts have recognized a non-statutory form of voluntary manslaughter: an unintentional killing in the course of an aggravated assault."

Defendant's voluntary manslaughter argument is based on People v. Garcia (2008) 162 Cal.App.4th 18 (Garcia). In that case, the defendant assaulted the victim with the butt of a gun, causing the victim to strike his head on the pavement and suffer fatal head injuries. Defendant argued he had only meant to hurt the victim and not to kill him. The jury was instructed on murder, and the lesser included offense of voluntary manslaughter based on provocation or imperfect self-defense. The defendant was convicted of voluntary manslaughter. On appeal, the defendant argued the trial court had a sua sponte duty to instruct the jury on involuntary manslaughter because there was substantial evidence the victim was killed without malice, i.e., without an intent to kill or conscious disregard for human life. (Id. at p. 26.)

Garcia rejected defendant's involuntary manslaughter argument. In doing so, however, Garcia stated that "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (Garcia, supra, 162 Cal.App.4th at p. 31.)

In People v. Bryant (June 3, 2013, S196365) -- Cal.4th -- [2013 WL 2372310] (Bryant), the Fourth District relied on this language in Garcia and held the trial court erred in failing to instruct the jury, sua sponte, that an unintentional killing without malice during the course of an inherently dangerous

24

assaultive felony constituted voluntary manslaughter. (<u>Bryant</u>, supra, at pp. 2–3.)

When defendant filed his brief in his appeal, he relied on the Fourth District's opinion in <u>Bryant</u>. Defendant argued the trial court in this case also had a sua sponte duty to give the same voluntary manslaughter instruction, based on <u>Bryant</u>'s interpretation of <u>Garcia</u>. At the time that defendant filed his brief, however, the California Supreme Court had granted review in <u>Bryant</u> and the case was not citable. (<u>People v. Bryant</u>, review granted Nov. 16, 2011, S196365.) Nevertheless, defendant insisted the trial court had a duty to give the same type of sua sponte instruction on voluntary manslaughter as the Fourth District formulated in <u>Bryant</u>, and suggested in dicta in <u>Garcia</u>. [FN11]

> [FN11: We note that defendant was tried and convicted in this case in June 2011. The Fourth District filed its appellate opinion in <u>Bryant</u> in August 2011, and the California Supreme Court granted review in November 2011. The trial court in this case could hardly have acquired a sua sponte duty to instruct on a theory that was dicta in <u>Garcia</u>, had not been raised by defendant, and had not been addressed by an appellate court at the time of defendant's jury trial. As the California Supreme Court has explained, "the sua sponte 'rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.'" (<u>People v. Flannel</u> (1979) 25 Cal.3d 668, 683.)]

In any event, the California Supreme Court has now issued its opinion in <u>Bryant</u>, and rejected the Fourth District's interpretation of voluntary manslaughter and <u>Garcia</u>. <u>Bryant</u> explained: "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter. [Citation.]" (<u>Bryant</u>, supra, -- Cal.4th -- at p. 8.) "Although we have on occasion employed somewhat different formulations to define the offense of voluntary manslaughter, we have never suggested that it

25

could be committed without either an intent to kill or a conscious disregard for life." (Id. at pp. 9–10.)

Bryant clarified that the court had never held "that a defendant may be found guilty of voluntary manslaughter when he kills unintentionally and without conscious disregard for life." (Bryant, supra, -- Cal.4th -- at p. 11.)

> "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that ... Garcia ... suggested otherwise, it is now disapproved. [¶] Because a killing without malice in the commission of an inherently dangerous assaultive felony is not voluntary manslaughter, the trial court could not have erred in failing to instruct the jury that it was." (Id. at pp. 12.)

### D. *Analysis*

Defendant contends the trial court had a sua sponte duty to instruct the jury with Garcia's "nonstatutory" theory of voluntary manslaughter, based on an unintentional killing in the course of an aggravated assault. Defendant argues the jury could have found that defendant did not know or share Zayas's intent to kill even if he knew Zayas was armed, and the jury could have found that defendant only intended to aid and abet an aggravated assault and did not appreciate the danger to life.

Defendant's argument is meritless given the California Supreme Court's complete rejection of the Fourth District's interpretation of Garcia, and the possibility that such a theory of voluntary manslaughter exists. We thus conclude the trial court in this case did not have a sua sponte duty to instruct the jury on any nonstatutory version of voluntary manslaughter.

Garcia, 2013 WL 3286207, at *19–22.

### b. Applicable Law on Lesser Included Offense Instructions

"[T]he failure . . . to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1105-

26

06 (9th Cir. 1998). There is no Supreme Court authority holding that the Constitution entitles a defendant in a non-capital case to jury instructions on lesser included offenses. Beck v. Alabama, 447 U.S. 625, 638 n.14 (1980); Howell v. Mississippi, 543 U.S. 440, 445 (2005) (suggesting Beck does not apply in non-capital cases). Thus, a state court could not have applied Supreme Court authority unreasonably in denying a claim based on the failure to give a lesser included offense instruction in a non-capital case. 28 U.S.C. § 2254(d); Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (internal quotation omitted); see also United States v. Rivera-Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases."). Nonetheless, despite these holdings, the Ninth Circuit has stated, without deciding, that a defendant in a non-capital case may be entitled to lesser included offense instructions if those instructions encompass the defendant's theory of defense and are supported by substantial evidence. Solis v. Garcia, 219 F.3d 922, 929-30 (9th Cir. 2000).[1]

Errors in instructing the jury can only support federal habeas relief if they "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991)). Allegedly erroneous instructions "must be considered in the context of the instructions as a whole and the trial record." Id. at 72. Additionally, a state court's reasoned interpretation that a petitioner was not entitled to an instruction under state law binds this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per

---

[1] However, subsequent Ninth Circuit cases have cited Solis for the absolute proposition that there is no clearly established federal constitutional right to instructions on lesser-included offenses in non-capital cases. Rivera-Alonzo, 584 F.3d at 834 n.3; Cervantez v. Pliler, 360 Fed. Appx. 737, 738 (9th Cir.2009). District Courts have likewise questioned whether this statement in Solis is based on clearly established Supreme Court precedent. E.g. Chaidez v. Knowles, 258 F. Supp. 2d 1069, 1096 n.15 (N.D. Cal. 2003) (suggesting there is not clearly established Supreme Court authority for Solis proposition).

curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also Mullaney v. Wilbur, 421 U.S. 684, 691 & n.11 (1975) (holding that "state courts are the ultimate expositors of state law" and federal courts are bound by their interpretations of state law unless the holding "appears to be an obvious subterfuge to evade consideration of a federal issue") (citation and internal quotation omitted); see also Solis, 219 F.3d at 927 ("We accept, as we must, the California Supreme Court's identification of the elements of the offense."); Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (holding that state court's determination on what constitutes "an element of the offense . . . is not open to challenge on habeas review"); Melugin v. Hames, 38 F.3d 1478, 1487 (9th Cir. 1994) ("[The Ninth Circuit] must accept a state court ruling on questions of state law."). A state court's determination that the evidence does not support a requested instruction is entitled to a presumption of correctness from a federal habeas court. See Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005); see also Hartman v. Summers, 120 F.3d 157, 161 (9th Cir. 1997)

Finally, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619 at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353. In other words, the error must have resulted in "actual prejudice." Id.

### c. Analysis

As stated, there is no clearly established Supreme Court authority requiring that lesser included offense instructions be given in non-capital cases. Thus, the state court's rejection of this claim was not unreasonable.

In any event, Petitioner contends that he was entitled to a voluntary manslaughter instruction based on the Courts of Appeals' reasoning in Garcia and Bryant. However, the elements of the offense of manslaughter are a question of state substantive law. The California Supreme Court is the final arbiter of state law, and has rejected the existence

of a non-statutory form of voluntary manslaughter predicated on a killing without malice in the course of an inherently dangerous assaultive felony. <u>People v. Bryant</u>, 56 Cal. 4th 959, 970, 301 P.3d 1136, 1142 (2013). That decision is binding on this court. To the extent Petitioner contends this ruling is in error, a challenge to a jury instruction based solely on an error of state law is not cognizable. <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). The Court's habeas jurisdiction extends only to a claim that the conviction violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000). Here,

Finally, the failure to give the instruction did not violate due process. The instruction was inapplicable under state law, and there was therefore no substantial evidence to support giving it. Nor was Petitioner prejudiced, given that the jury could not have found him guilty of voluntary manslaughter in light of <u>Bryant</u>.

Petitioner is not entitled to relief on this claim.

## 2. Involuntary Manslaughter Instruction

Petitioner argues that the state court erred in failing to sua sponte give an involuntary manslaughter instruction on the ground that the jury could have concluded he had only the intent to aid and abet assault and battery, rather than murder.

### a. State Court Decision

The Fifth District Court of Appeal rejected this claim as follows:

> **V. *Involuntary manslaughter instructions***
>
> Defendant separately contends the court had a sua sponte duty to instruct on involuntary manslaughter as another lesser included offense of murder. "Involuntary manslaughter is manslaughter during 'the commission of an unlawful act, not amounting to a felony,' or during 'the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) 'The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful

but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection."' [Citation.]" (<u>People v. Murray</u> (2008) 167 Cal.App.4th 1133, 1140.) There also exists a nonstatutory form of the offense, which is based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. (<u>People v. Butler</u> (2010) 187 Cal.App.4th 998, 1007 .)

"[C]riminal negligence is the governing mens rea standard for all three forms of committing the offense. [Citations.]" (<u>People v. Butler</u>, supra, 187 Cal.App.4th at p. 1007.) Criminal negligence consists of "'aggravated, culpable, gross, or reckless' conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or indifference to the consequences of the conduct. [Citations.]" (<u>Garcia</u>, supra, 162 Cal.App.4th at pp. 27–28.)

As explained in section IV, ante, <u>Garcia</u> addressed whether the trial court in that case had a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense of murder, where the defendant hit the victim in the face with the butt of a shotgun. (<u>Garcia</u>, supra, 162 Cal.App.4th at p. 22.) Garcia clarified that an unlawful killing during the commission of an inherently dangerous felony was not involuntary manslaughter. (<u>Id.</u> at p. 31.) <u>Garcia</u> concluded the court did not have a sua sponte duty to give involuntary manslaughter instructions because the defendant's conduct constituted either assault with a deadly weapon or assault with a firearm, and both offenses were inherently dangerous felonies. (<u>Id.</u> at pp. 22, 31–32.)

Defendant argues that the court should have instructed on involuntary manslaughter in this case because the jurors could have had a reasonable doubt whether defendant knew Zayas was armed with a loaded gun. Defendant asserts that if he "only intended to aid and abet a simple assault or battery and acted with criminal negligence, he would be guilty of involuntary manslaughter at most."

While <u>Bryant</u> rejected the Fourth District's discussion of <u>Garcia</u> and voluntary manslaughter, the majority opinion declined to address <u>Garcia</u>'s analysis of involuntary manslaughter. (<u>People v. Bryant</u>, supra, -- Cal.4th -- at p. 12.) We note that Justice Kennard filed a concurring opinion and found an assault with a deadly weapon can constitute the unlawful act that makes a killing which occurs during the assault an involuntary manslaughter. (<u>Id.</u> at pp. 4–5 [Conc.

Opn., Kennard J.].) Justice Kennard believed "a killing committed during an unlawful act amounting to a felony is involuntary manslaughter, notwithstanding the appearance of the phrase 'not amounting to felony' in section 192's subdivision (b)...." (Id. at p. 6.) In reaching this conclusion, however, Justice Kennard further found the trial court in Bryant did not have a sua sponte duty to instruct on this theory of involuntary manslaughter, because it was based "on a legal principle that has been so 'obfuscated by infrequent reference and inadequate elucidation' that it cannot be considered a general principal of law. [Citation.]." (Id. at pp. 6–7.)

In any event, while a homicide may constitute involuntary manslaughter if it occurs during the commission of a misdemeanor inherently dangerous to human life, that definition would not apply in this case. Both assault with a deadly weapon and assault with a firearm are inherently dangerous felonies. (Garcia, supra, 162 Cal.App.4th at p. 28, fn. 4.) Defendant admitted that he knew Zayas had retrieved a gun, Zayas was angry and upset about his brother's death at the hands of southerners, and defendant agreed with Zayas and the others to drive around and look for southerners. Defendant also admitted that he and his associates carried weapons to feel safe from southerners because of past shooting incidents.

An involuntary manslaughter instruction was not warranted under the facts of this case. An instruction on a lesser included offense is not required if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. (People v. Kelly, supra, 51 Cal.3d at p. 959.) A manslaughter theory requires the killing be committed *without malice* (People v. Cook, supra, 39 Cal.4th at p. 596), whereas the evidence in this case showed implied malice. As explained *ante*, malice is implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]...." (People v. Lasko, supra, 23 Cal.4th at p. 107; Swain, supra, 12 Cal.4th at p. 602.) A defendant acts with implied malice when he acts with an awareness of endangering human life. (People v. Knoller, supra, 41 Cal.4th at pp. 143 & 153.)

Defendant's own statements established implied malice in this case. During his second interview with Detective

31

Zaragoza, defendant admitted he knew Zayas was upset about his brother's death, and that Zayas retrieved the gun from his house and returned to the car with it. Defendant had seen Zayas with a gun on previous occasions, defendant had been shot at by southerners before, and they carried guns to feel safe from the southerners.

When asked who came up with the idea to go mobbing, defendant replied: "Well, we all did but we never thought that that was going to happen." Defendant also said that "mobbing meant they were going to look for someone or just drive around and cruise, and denied that they were looking for Surenos.

On further questioning, however, defendant said that Zayas said they should go mobbing and "look for some scraps." Defendant said they "ran into those guys" who were wearing blue, and Zayas said they were "scraps." Defendant admitted that he said, "[F]* * * 'em" when he saw the two men on the street, and Zayas got out of the car and fired the gunshots.

The prosecution's gang expert testified that "mobbing" meant "to get together" in a vehicle, look for a rival gang member, and take action against that person. It was common for gang members to go mobbing and look for their rivals. Detective Sanchez did not know if it was common for gang members to have a weapon while they were mobbing. "Scrap hunting" meant that a Norteno was looking for a rival Sureno. The expert further testified that when defendant saw the two men on the street and said, "'[F]* * * 'em,'" such a phrase meant to assault their rivals.

The court did not have a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense of murder. To be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (McCoy, supra, 25 Cal.4th at p. 1118.) Defendant's admission that he made such statements when he knew that Zayas had a gun, Zayas was upset about his brother's gang-related death, and Zayas was looking for "scraps," showed his intent to encourage or facilitate Zayas's intent to kill, and that he acted with an awareness of endangering human life. (People v. Knoller, supra, 41 Cal.4th at pp. 143 & 153.)

Garcia, 2013 WL 3286207, at *22-25.

32

### b. Analysis

Again, because there is no clearly established Supreme Court authority requiring that lesser included offense instructions be given in non-capital cases, the state court's rejection of this claim was not unreasonable. Additionally, there was no substantial evidence to support giving the instruction.

Involuntary manslaughter is the killing without malice in the commission of an unlawful act not amounting to a felony. Cal. Penal Code § 192(b). Here, the Court of Appeal concluded that the evidence implied malice, making an involuntary manslaughter instruction unavailable. This conclusion was not unreasonable. Petitioner knew Zayas was upset about his brother's death at the hands of Surenos, knew that Zayas retrieved a gun, and knew that Zayas wanted to "look for some scraps," i.e., Surenos. When Petitioner saw the men on the street, he stated, "[F]* * * 'em." The Court of Appeal was not unreasonable in determining that these facts were sufficient to demonstrate that Petitioner acted with implied malice, i.e., with an awareness of endangering human life.

Because the evidence implied malice, an involuntary manslaughter instruction was precluded. See Solis, 219 F.3d at 930. There was not substantial evidence to support giving the instruction, and therefore no possible constitutional error occurred. Petitioner is not entitled to relief on this claim.

### B. Claim Two: CALCRIM No.1401

Petitioner contends that the jury was not properly instructed on the gang enhancement in CALCRIM No. 1401.

### 1. State Court Decision

The Fifth District Court of Appeal rejected this claims as follows:

> Defendant was convicted of second degree murder and the jury found the gang enhancement true. Defendant contends the jury's true finding on the gang enhancement must be stricken because CALCRIM No. 1401, which defined the gang enhancement, omitted elements of the enhancement and "confusingly" referred the jury to other instructions.

As with his other instructional challenges, defendant failed to object to CALCRIM No. 1401, but we will address and reject his contentions.

## A. *CALCRIM No. 736*

As explained above, defendant was charged with conspiracy to commit murder, and first degree murder with the gang special circumstance (§ 190.2, subd. (a)(22)). The gang enhancement was alleged as to both counts. (§ 186.22, subd. (b)(1)(C).)

As to the gang allegations, the jury first received CALCRIM No. 736, which defined the gang special circumstance.

"The defendant is charged with a special circumstance of committing murder while an active participant in a criminal street gang. To prove that this special circumstance is true, the People must prove that, one, did defendant intend to kill Arturo Bello.

"Two, at the time of the killing, the defendant was an active participant in a criminal street gang.

"Three, the defendant knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity.

"And four, the [murder] was carried out to further the activities of the criminal street gang.

"Active participation means involvement with a criminal street gang in a way that is more than passive or in name only.

"The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang or that he was an actual member of the gang.

"*A criminal street gang* is any ongoing organization, association, or group of three or more persons whether formal or [informal], one, that has a common name or common identifying sign or symbol.

"Two, that has as one or more of its *primary activities* the commission of murder, attempted murder, vandalism, terrorist threats, witness intimidation [,] carjacking, assault with [a] deadly weapon, or entering an inhabited dwelling.

"Three, whose members when acting alone or together engage in or have engaged in *a pattern of criminal gang activity.*

"*In order to qualify as a primary activity*, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"*A pattern of criminal gang activity* is [sic] used here means, one, the commission of, the attempted commission of, or conviction of any combination of two or more of the following crimes or two or more of the occurrence of one or more of the following crimes: Murder, attempted murder, or assault with a deadly weapon.

"Two, at least one of those crimes was committed after September 26, 1988.

"Three, the most recent crime occurred within three years of one of the earlier crimes.

"Four, the crimes were committed on separate occasions or by two or more persons. The crimes, if any, that established a pattern of criminal gang activity need not be established.

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether *one of the group[']s primary activities* was commiss[ion] of that crime and whether a pattern of criminal gang activity has been proved. You may not find that there was *a pattern of criminal gang activity* unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

"Other instructions explain what is necessary for the People to prove that a member of the gang or defendant committed murder, attempted murder, or assault with a deadly weapon." (Italics added.)

## B. *CALCRIM No. 1401*

Immediately after receiving CALCRIM No. 736, the jury received CALCRIM No. 1401, to define the elements of the gang enhancement. This instruction advised the jury that if it found defendant guilty of the charged offenses, or the lesser included offense of second degree murder, it had to decide whether, for each crime, "the People have proved the

additional allegation" that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, and "decide whether the People have proved this allegation for each crime and return a separate finding for each crime."

"To prove this allegation, the People must prove that, one, the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang.

"And, two, the defendant intended to assist, further, or promote criminal conduct by gang members. *A criminal street gang is defined in another instruction to which you should refer.*

"The crimes, if any, that establish *a pattern of criminal gang activity* need not be gang-related. The People need not prove the defendant is an active or current member of the alleged criminal street gang.

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's *primary activities* was commission of that crime, and *whether a pattern of criminal gang activity* has been proved.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find the allegation has not been proved." (Italics added.)

The italicized phrase is consistent with one of the options provided by the pattern instruction, if the elements of a criminal street gang are given to the jury in another instruction.

### C. *Analysis*

Defendant contends the jury was not correctly instructed on the elements of the gang enhancement because CALCRIM No. 1401 omitted the definitions of a gang's "primary activity" and "pattern of criminal gang activity."

We must view the instructions as a whole and determine their correctness from the entire charge to the jury, not from a consideration of one instruction alone. (People v. Wilson, supra, 3 Cal.4th at p. 943.) CALCRIM No. 1401 specifically instructed the jury that a "criminal street gang" was defined in "another instruction to which you should refer." The identity of

that other instruction could not have been a mystery, since the court had just read CALCRIM No. 736 to the jury immediately before it read CALCRIM No. 1401. While CALCRIM No. 736 began with the definition of the elements for the gang special circumstance, that instruction also contained separate and correct definitions of a "criminal street gang," a gang's "primary activities," and the "pattern of criminal gang activity." The entirety of the instructions thus reflects that the jury was correctly instructed on the elements of the gang enhancement.

Defendant concedes that CALCRIM No. 1401 referred the jury to "other instructions," but asserts that the jury would not have understood that it needed to "look at" CALCRIM No. 736 for the definitions of "primary activities" and "pattern of criminal gang activity," and the jury would have been confused by CALCRIM No. 736's discussion of the gang special circumstance and the active participation requirement for that special circumstance. The references between the two instructions are clear. Moreover, defendant did not request clarification of the otherwise adequate instructions, and he may not complain here. (<u>People v. Alvarez</u> (1996) 14 Cal.4th 155, 223.)

Defendant further argues the jury would have been confused by the inclusion of assault with a deadly weapon and conspiracy to commit murder in CALCRIM No. 736's list of predicate offenses, because the gang expert did not testify those offenses were a primary activities, and jury was not otherwise instructed on the elements of assault with a deadly weapon.

The prosecution's gang expert testified the primary activities of the Norteno gang included homicide, attempted homicide, robbery, carjacking, and felony graffiti. The expert testified about two predicate offenses, based on convictions of Norteno gang members for committing the offense of assault with a deadly weapon on members of the Sureno gang in the Orosi area. As noted above, defendant did not request clarification of the otherwise adequate instructions, and he may not complain here. (<u>People v. Alvarez</u>, supra, 14 Cal.4th at p. 223.) Moreover, any error is necessarily harmless since the parties never disputed the existence of the Nortenos as a criminal street gang, or challenged the evidence about the predicate offenses. (<u>Chapman v. California</u>, supra, 386 U.S. at pp. 23–24; <u>People v. Wilson</u> (2008) 44 Cal.4th 758, 804.) [FN12]

[FN12: For similar reasons, we also reject defendant's separate contention that the jury's true finding on the section 12022.53, subdivision (e) firearm enhancement must be stricken since that enhancement was based on the true finding on the gang enhancement.]

Garcia, 2013 WL 3286207, at *25–28.

## 2. Procedural Default

The state court determined that the gang enhancement instruction was adequate under state law. Moreover, as to Petitioner's claim that the instruction was confusing or unclear, the state court noted that Petitioner did not object to the instruction in the trial court and therefore "may not complain here." Garcia, 2013 WL 3286207, at *27-28. Respondent contends that the state court's imposition of a procedural bar forecloses federal review of the claim. The Court agrees.

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86–87 (1977). In turn, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements. . . ."). This concept has been commonly referred to as the procedural default doctrine. This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32. If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park, 202 F.3d at 1150.

The procedural default doctrine will apply only if the application of the state procedural rule provides "an adequate and independent state law basis" on which the state court can deny relief. Park, 202 F.3d at 1151 (quoting Coleman, 501 U.S. at 729–30). "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse, 244 F.3d at 704 (citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.' " (quoting Coleman, 501 U.S. at 735). "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.") (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)). Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'" Id. at 377 (quoting Morales, 85 F.3d at 1392).

To overcome a procedural default a prisoner must 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.' Coleman, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must

be something external to the petitioner, something that cannot fairly be attributed to him: '[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Id. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).

The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition for procedural default where there was a complete failure to object at trial. See e.g., Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (barring review of jury instruction error claim because no contemporaneous objection). Here, the state appellate court pointed out that Petitioner failed to object to or seek clarification of the challenged instructions as given. Garcia, 2013 WL 3286207, at *27-28. Petitioner's failure to object at trial to the use of CALCRIM Nos. 736 and 1401 bars his claim that their use violated his right to due process. However, even if the Court overlooks the procedural default, this claim fails on the merits as discussed next.

### 3. Merits Analysis

Instructional error warrants federal habeas relief only if the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process[.]" Waddington v. Saruasad, 555 U.S. 179, 191 (2009) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Dixon v. Williams, 750 F.3d 1027, 1032 (9th Cir. 2014) (citation omitted). To warrant relief, the erroneous instruction must have had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 61-62 (2008) (per curiam) (citing Brecht, 507 U.S. at 623). The instruction "may not be judged in artificial isolation," but instead must be considered "in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72.

First here, the state court determined that the instruction as given was correct under state law. A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988). Therefore, the state appellate court's determination—that the challenged instruction was correct as a matter of state law—is binding on this Court. See id.

Next, Petitioner contends that the instruction was deficient and violated due process because CALCRIM No. 1401 did not define "primary activity" and "pattern of criminal gang activity." However, it is undisputed that these terms were defined in CALCRIM No. 736, which was given immediately before CALCRIM No. 1401. When viewed "in the context of the instructions as a whole and the trial record," McGuire, 502 U.S. at 72, the instructions cannot be said to have violated due process in this regard. The state court was not unreasonable in rejecting this claim.

Petitioner also contends that the instructions were confusing because CALCRIM No. 736 states that the prosecution was required to prove "the defendant was an active participant in a criminal street gang," while CALCRIM No. 1401 states that the prosecution "need not prove the defendant is an active or current member of the alleged criminal street gang." This contention was not addressed by the state court. Regardless, the instructions accurately defined the gang special circumstance and gang enhancement, respectively. Compare Cal Penal Code § 190.2(a)(22) (gang special circumstance applicable to "an active participant in a criminal street gang"), with Cal. Penal Code § 186.22(b)(1) (active participation not required for gang sentencing enhancement). The instructions do not raise due process concerns in this regard. See Estelle, 502 U.S. at 72; Dixon, 750 F.3d at 1032.

Petitioner next contends that the instructions were flawed because CALCRIM No. 736 did not track precisely the prosecution's gang expert's testimony. Specifically, the instruction identified assault with a deadly weapon as a primary activity of the gang, but

41

the gang expert did not testify that assault with a deadly weapon was a primary activity. Petitioner also complains that assault with a deadly weapon was not defined. The instruction identified the following primary activities of a gang: "the commission of murder, attempted murder, vandalism, terrorist threats, witness intimidation[,] carjacking, assault with [a] deadly weapon, or entering an inhabited dwelling." Garcia, 2013 WL 3286207, at *26. The gang expert testified that the primary activities of the Norteno gang included homicide, attempted homicide, robbery, carjacking, and felony graffiti. He also identified assault with a deadly weapon and conspiracy to commit murder as predicate offenses, based on prior convictions of Norteno gang members. The Court fails to see how the instructions were deficient in this regard such that they violated due process.

Furthermore, the state court determined that any error in this regard was harmless under Chapman v. California, 386 U.S. 18 (1967). Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). However, when a state court's Chapman decision is reviewed under AEDPA, a habeas Petitioner must establish that the trial court's error resulted in "actual prejudice." Davis v. Ayala, 135 S. Ct. 2187, 2197 (2015) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). This requires more than a "reasonable possibility" that the error was harmful. Brecht, 507 U.S. at 637. Instead, the petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Davis, 135 S.Ct. at 2199 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). In other words, "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." Id. (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). Here, the state court's harmlessness determination was not unreasonable. The state court noted that "the parties never disputed the

existence of the Nortenos as a criminal street gang, or challenged the evidence about the predicate offenses." <u>Garcia</u>, No. 2013 WL 3286207, at *28. Thus, the potential for confusion complained of by Petitioner is unlikely to have had any effect on the jury's verdict.

Finally, Petitioner complains that the instructions would have permitted the jury to improperly consider conspiracy to commit murder as a primary activity or predicate offense. However, as the Court of Appeal acknowledged separately, the conspiracy to commit murder instruction was flawed and the conviction on that ground could not be sustained. <u>Garcia</u>, 2013 WL 3286207, at *15. Accordingly, Petitioner argues, the gang enhancement also must be reversed because the instructions advised the jury: "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group[']s primary activities was commiss[ion] of that crime and whether a pattern of criminal gang activity has been proved." However, conspiracy to commit murder was not listed as a qualifying primary activity under CALCRIM No. 736. Furthermore, as stated, there was no dispute at trial that the Nortenos constituted a criminal street gang.

Accordingly, Petitioner is not entitled to relief on this claim.

**C.    Claim Three: CALCRIM No. 400**

Petitioner contends that the use of the phrase "equally guilty" in CALCRIM No. 400 was erroneous.

**1.    State Court Decision**

The Fifth District Court of Appeal rejected Petitioner's claim as follows:

> At trial, the parties did not dispute that Zayas was the gunman. Defendant was charged with first degree murder as an aider and abettor, and convicted of second degree murder as a lesser included offense.
>
> The jury received the following version of CALCRIM No. 400, on aiding and abetting:

43

"A person may be guilty of a crime in two ways: One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator, who directly committed the crime.

"A person is *equally guilty* of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." (Italics added.)

Defendant argues his conviction for second degree murder must be reversed because of the inclusion of the italicized phrase "equally guilty" in CALCRIM No. 400. Defendant argues this phrase has been repeatedly criticized as confusing, and it has been removed from subsequent versions of CALCRIM No. 400. Defendant further argues the inclusion of the phrase in this case was prejudicial because defendant did not share the same intent as the gunman, since defendant allegedly did not know that Zayas's gun was loaded or he intended to shoot someone.

The People contend that defendant has forfeited review of this issue since he did not object to CALCRIM No. 400. However, defendant's claim that the instruction misstated the law or violated his right to due process "is not of the type that must be preserved by objection. [Citations.]" (<u>People v. Smithey</u>, <u>supra</u>, 20 Cal.4th at p. 976, fn. 7; <u>see also</u> § 1259; <u>People v. Flood</u> (1998) 18 Cal.4th 470, 482, fn. 7.) We thus turn to the merits of defendant's argument.

## A. *Aiding and Abetting*

As explained above, murder is an unlawful killing committed with malice aforethought. (<u>People v. Cravens</u> (2012) 53 Cal.4th 500, 507.) Malice may be either express or implied. (<u>Ibid.</u>)

A defendant may be culpable for a crime as a direct perpetrator or as an aider and abettor. To be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (<u>People v. McCoy</u> (2001) 25 Cal.4th 1111, 1118 (<u>McCoy</u>).)

With respect to the target offense intended by the aider and abettor, the aider and abettor's mens rea is the intent associated with the target offense. (<u>McCoy</u>, <u>supra</u>, 25 Cal.4th

at p. 1118 & fn. 1.) "Generally, a person who is found to have aided another person to commit a crime *is* 'equally guilty' of that crime. [Citations.]" (People v. Lopez (2011) 198 Cal.App.4th 1106, 1118 (Lopez), italics in original.) In some circumstances, however, the aider and abettor may be found guilty of a target offense that is greater or lesser than the offense attributed to the perpetrator, depending on the particular states of mind of the aider and abettor and the perpetrator and the availability of defenses to a particular crime. (McCoy, supra, 25 Cal.4th at pp. 1114, 1118–1120; People v. Nero (2010) 181 Cal.App.4th 504, 507, 513–517 (Nero); People v. Samaniego (2009) 172 Cal.App.4th 1148, 1164 (Samaniego); Lopez, supra, 198 Cal.App.4th at p. 1118.) In the context of a target offense, aider and abettor liability is premised on the combined acts of all the participants, and "on the aider and abettor's *own mens rea.*" (McCoy, supra, 25 Cal.4th at p. 1120, italics added.)

An aider and abettor may be guilty of a target offense that is lesser than the perpetrator's offense, depending on the aider and abettor's state of mind and the availability of defenses. (See Nero, supra, 181 Cal.App.4th at pp. 513–517; Samaniego, supra, 172 Cal.App.4th at pp. 1163–1164.) As a result, it has been recognized that the "equally guilty" language in CALCRIM No. 400 can be confusing or misleading. (People v. Loza (2012) 207 Cal.App.4th 332, 348, fn. 8 (Loza); Lopez, supra, 198 Cal.App.4th at pp. 1118–1119 & fn. 5; Samaniego, supra, 172 Cal.App.4th at pp. 1163–1165; Nero, supra, 181 Cal.App.4th at pp. 510 & 518.) The "equally guilty" language creates the risk that the jury might think that if it finds the defendant in some way aided the perpetrator with the criminal conduct, it necessarily must find the defendant guilty of *the same offense* as the perpetrator, without determining the aider and abettor's particular state of mind. (See Loza, supra, 207 Cal.App.4th at p. 356; Nero, supra, 181 Cal.App.4th at p. 518; Samaniego, supra, 172 Cal.App.4th at p. 1165.)

## B. *Analysis*

As defendant correctly points out, the word "equally" has been removed from the "equally guilty" phrase in the pattern instruction on aiding and abetting. (Loza, supra, 207 Cal.App.4th 332, 348, fn. 8.) Defendant argues the court erroneously included the phrase in the version of CALCRIM No. 400 given to the jury, and that error requires reversal of his murder conviction. However, even assuming the inclusion of the phrase was erroneous, the record demonstrates that

any error was harmless beyond a reasonable doubt pursuant to Chapman v. California, supra, 386 U.S. 18. (Samaniego, supra, 172 Cal.App.4th at p. 1165 [applying Chapman test to erroneous inclusion of "equally guilty" in CALCRIM No. 400]; Lopez, supra, 172 Cal.App.4th at pp. 1119–1120.)

In this case, the jury received both the general aiding and abetting instruction containing the "equally guilty" language (CALCRIM No. 400), and the more specific instruction (CALCRIM No. 401) that explained in detail the mental state necessary to impose culpability on the basis of aiding and abetting rather than direct perpetration of a crime. CALCRIM No. 401 stated that for defendant to be culpable as an aider and abettor, the prosecution had to prove that the defendant knew "the perpetrator intended to commit the crime," the defendant intended to aid and abet the perpetrator in committing the crime, and the "defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime." CALCRIM No. 401 correctly explained that "[s]omeone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does, in fact, aid, facili[tate], promote, encourage, or instigate the perpetrator's commission of that crime."

More importantly, the verdict in this case indicates that the jury was not confused by the "equally guilty" language. Defendant was charged with first degree premeditated murder with a special circumstance, based on the prosecution's theory that defendant shared Zayas's alleged premeditated, deliberate, and willful intent to kill southerner gang members. The jury found defendant not guilty of the charged offense, and guilty of second degree murder as a lesser included offense, thus rejecting the prosecution's theory that defendant and Zayas shared the same intent.

In addition, this case is dissimilar from Nero and Loza, which deemed the "equally guilty" language confusing and prejudicial. Nero and Loza found the inclusion of the phrase was prejudicial because the juries in both cases asked questions during the deliberations which reflected confusion about whether an aider and abettor could have a less culpable state of mind, and the trial courts failed to clarify the confusion. (Nero, supra, 181 Cal.App.4th at pp. 507, 510–520 [jurors asked if aider and abettor could be less culpable; court re-read instruction containing "equally guilty" language]; Loza, supra, 207 Cal.App.4th at pp. 349, 352, 355–357 [jurors asked if they should consider the aider and abettor's state of mind; court referred jury back to the instructions].)

46

In contrast, the instructions in this case directed the jury to examine defendant's own particular mental state, and the jury did not ask any questions suggesting it did not fully understand this requirement. The jury was also correctly instructed as to the definitions of willful, premeditated, and deliberate attempted murder, and the mental state of malice. The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the inclusion in this case of the phrase "equally guilty" in CALCRIM No. 400 was harmless beyond a reasonable doubt. (<u>Samaniego</u>, <u>supra</u>, 172 Cal.App.4th at p. 1165.)

People v. Garcia, No. F062834, 2013 WL 3286207, at *17–19 (Cal. Ct. App. June 27, 2013)

## 2.   Analysis

The California Court of Appeal noted that the inclusion of the "equally guilty" language in CALCRIM No. 400 can be confusing and misleading, but stopped short of determining that the instruction was erroneous. Instead, the state court concluded that any error was harmless under <u>Chapman</u>. This determination was not unreasonable. <u>Davis</u>, 135 S.Ct. at 2199.

The state court considered the challenged portion of CALCRIM No. 400 in the context of the jury instructions as a whole. The state court noted that the jury was given other instructions on how to evaluate Petitioner's potential liability. Immediately following CALCRIM No. 400, the jury was instructed with CALCRIM No. 401 which provided a more detailed explanation of the mens rea required for aiding and abetting liability, specifically that the aider and abettor must have intended to aid and abet the perpetrator in the commission of the crime, and that mere presence at the crime scene or knowledge of the perpetrator's intend, standing alone, is insufficient to support liability. (RT vol. 4 at 484.) Based on the instructions as a whole, the state court determined that the "equally guilty" language was harmless.  This decision is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103.

Accordingly, Petitioner is not entitled to relief on this claim.

**D.    Claim Four: Sufficiency of the Evidence**

Petitioner argues that there is insufficient evidence to support his conviction for aiding and abetting murder.

**1.    State Court Decision**

The Fifth District Court of Appeal rejected Petitioner's claim as follows:

> Defendant contends there is insufficient evidence to support his conviction for second degree murder as an aider and abettor because there is no evidence that he had the requisite malice, he did not take "any concrete action" to assist Zayas (the gunman) as he fired the fatal shots, and defendant's mere presence at the scene does not constitute aiding and abetting.
>
> In section II, *ante*, we set forth the standard of review to determine whether a conviction is supported by substantial evidence. In section III, *ante*, we explained that to be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (McCoy, supra, 25 Cal.4th at p. 1118.)
>
> We have also explained that the trial court did not have a sua sponte duty to instruct on voluntary and involuntary manslaughter as lesser included offenses of murder because defendant, if guilty at all, was guilty of the greater offense of implied malice second degree murder. (People v. Kelly, supra, 51 Cal.3d at p. 959.) Malice is implied "'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]...." (People v. Lasko, supra, 23 Cal.4th at p. 107; Swain, supra, 12 Cal.4th at p. 602.) A defendant acts with implied malice when he acts with an awareness of endangering human life. (People v. Knoller, supra, 41 Cal.4th at pp. 143 & 153.)
>
> As explained in sections III(D) and IV, *ante*, there is overwhelming evidence to support defendant's conviction as an aider and abettor for second degree murder under an implied malice theory. We need not restate this analysis and

find that defendant's conviction for second degree murder is supported by overwhelming evidence.

In reaching this conclusion, we note that during his interviews with law enforcement officers, defendant sought to present an image of a bystander—one who, by happenstance of residence was left little choice but to be in the company of gang members without actual affiliation with their enterprise, and who just happened to be in the wrong place (Josh's car), with the wrong people (Josh, Santos, and Zayas) at the wrong time (when Zayas murdered the victim). Indeed, there may be slight ring of truth to the defendant's contention about the unfortunate circumstances that led to the tragic events on one fateful day. Yet, while the social conditions that contributed to defendant's decisions may provide some explanation, they do not constitute excuse. Moreover, as the second interview continued, defendant admitted that he knew much more about the events which led up to the murder than he had previously indicated. Indeed, defendant essentially conceded he was not an idle bystander that day. Among other things, we learned from the defendant's police interview, that he was aware of Zayas's purposeful retrieval and possession of a gun that day. Defendant explained that he and his friends had previously been shot at, the shots were fired by Southerners, and that was why he felt they needed to carry weapons. Defendant knew that Zayas was very upset about his brother's murder at the hands of southerners, and that they all agreed to go mobbing. When defendant saw the two men dressed in blue, he yelled out, "F* * * 'em," and Zayas started shooting. The consequences of the activities of defendant and his compatriots on the day in question were not fortuitous, and the law imposes accountability on the defendant notwithstanding that he did not pull the trigger.

Garcia, 2013 WL 3286207, at *24–25.

## 2.     Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

49

the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 132 S.Ct. 2, *4, 181 L.Ed. 2d 311 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

Petitioner's claim is whether there was sufficient evidence to satisfy the elements of second degree murder under California law. Under California law, murder is an unlawful killing with malice aforethought. Cal. Penal Code § 187(a). Malice is express when the defendant manifests a deliberate intention to take away the life of another. People v. Blakeley, 23 Cal. 4th 82, 87, 96 (2000). A defendant acts with implied malice when he acts with an awareness of endangering human life. People v. Knoller 41 Cal. 4th 139, 143, 153 (2007). More specifically, malice is implied "'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'" To be culpable as an aider and abettor, the defendant must have acted with knowledge of the criminal purpose of the perpetrator, and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. People v. McCoy, 25 Cal. 4th 1111, 1118 (2001).

### 3. Analysis

The state court was not unreasonable in determining that substantial evidence supports Petitioner's conviction as an aider and abettor to second degree murder. As the state court noted, there is a "slight ring of truth" to Petitioner's contention that he was in the wrong place, with the wrong people, at the wrong time. Garcia, 2013 WL 3286207, at *25. Nevertheless, the evidence showed that Petitioner knew Zayas was upset about his brother's death at the hands of Surenos, knew that Zayas retrieved a gun, and knew that Zayas wanted to "look for some scraps," i.e., Surenos. When Petitioner saw the men on the street, he stated, "[F]* * * 'em." As concluded above, the Court of Appeal was not unreasonable in determining that these facts were sufficient to demonstrate that Petitioner acted with implied malice, i.e., with an awareness of endangering human life. In light of these facts, the Court cannot say that "no rational trier of fact could have agreed with the jury." Cavazos, 565 U.S. 1 (2011). Petitioner is not entitled to relief on this claim.

**E.    Claim Five: Failure to Stay Firearm Enhancement**

Petitioner challenges his firearm enhancement on several grounds. First, he contends that his constitutional rights were violated when the trial court failed to stay the firearm enhancement under California Penal Code section 654. Second, he claims that the firearm enhancement was unproven. Lastly, he contends that the sentence on the firearm enhancement constitutes cruel and unusual punishment in violation of the Eighth Amendment.

**1.    State Court Decision**

The Fifth District Court of Appeal rejected this claim as follows:

> Defendant contends the court improperly sentenced him to 15 years to life for second degree murder plus a consecutive term of 25 years to life for the firearm enhancement. Defendant argues the court should have stayed the term for the section 12022.53 firearm enhancement pursuant to section 654 because the firearm was used to commit the murder, he was not the gunman, and he was only convicted as an aider and abettor.
>
> **A.    Section 12022.53 and Aiders and Abettors**
>
> Section 12022.53 establishes mandatory sentence enhancements for persons convicted of specified felonies, including murder, who discharge a firearm in the commission of the offense. (§ 12022.53, subds. (b)(e).) Subdivision (d) of section 12022.53 mandates a consecutive enhancement of 25 years to life for any person who personally and intentionally discharges a firearm causing death in the commission of one of the specified felonies. Subdivision (e)(1) imposes vicarious liability on an aider or abettor who committed the specified offense for the benefit of, at the direction of, or in association with a criminal street gang. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171.)
>
> Section 12022.53, subdivisions (d) and (e)(1), read together, require the imposition of a consecutive sentence enhancement of 25 years to life when a defendant is convicted of a murder committed for the benefit of a criminal street gang, and any principal in the offense "'personally and intentionally discharges a firearm'" that causes death to any person other than an accomplice. (*People v. Hernandez* (2005) 134 Cal.App.4th 474, 480.)

52

In order to find an aider and abettor subject to the sentence enhancements of section 12022.53, the aider and abettor must be convicted of the underlying offense (i.e., murder), and the gang enhancement found true. There is no requirement that the principal who intentionally and personally discharged the firearm must be convicted of the offense. (*People v. Garcia,* supra, 28 Cal.4th at p. 1174.)

## B.    Section 654

In *People v. Hutchins* (2001) 90 Cal.App.4th 1308 (*Hutchins*), the court rejected the application of section 654 to a section 12022.53, subdivision (d) enhancement, in a case where the defendant committed a murder using a gun. The defendant argued that the trial court punished him twice for firing the shots that killed the victim by sentencing him to 15 years to life for second degree murder plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement. *Hutchins* rejected the defendant's argument that imposition of the firearm enhancement violated section 654. "Clearly, in enacting this provision the Legislature intended to mandate the imposition of substantially increased penalties where one of a number of crimes, including homicide, was committed by the use of a firearm. In so doing, the express language of the statute indicates the Legislature's intent that section 654 *not apply* to suspend or stay execution or imposition of such enhanced penalties…." (*Hutchins, supra,* at p. 1313, italics in original.) Thus, "where imposition of a firearms use enhancement is made *mandatory* notwithstanding other sentencing laws and statutes, it is *error* to apply section 654 to stay imposition of such an enhancement. [Citations.]" (*Id.* at p. 1314, italics in original; see also *People v. Sanders* (2003) 111 Cal.App.4th 1371, 1375.)

In *People v. Palacios* (2007) 41 Cal.4th 720, the court cited *Hutchins* with approval, noted that the Legislature mandated that section 12022.53 enhancements "shall be imposed '[n]otwithstanding any other provision of law,'" and held that "in enacting section 12022.53, the Legislature made clear that it intended to create a sentencing scheme unfettered by section 654." (*Palacios*, supra, at pp. 728, 733, italics added.) "Nothing in the statute suggests the Legislature intended to override section 654 as to some applications of section 12022.53, but not others." (*Id.* at p. 733.)

## C.   <u>Analysis</u>

Defendant argues section 654 may be applied to his case, and the reasoning in *Palacios* and *Hutchins* is inapplicable to these facts, because he was not the gunman, he did not personally use or discharge the firearm, and the enhancement was imposed based on his liability as an aider and abettor pursuant to section 12022.53, subdivision (e)(1). This is a distinction without a difference. As explained above, the firearm enhancement was pleaded and proved pursuant to section 12022.53, subdivisions (d) *and* (e)(1). Section 12022.53, subdivision (d) mandates a consecutive term of 25 years to life if a person convicted of an enumerated felony "intentionally and personally discharged a firearm and proximately caused great bodily injury ... or death ...." "Section 12022.53, subdivision (e)(1), imposes vicarious liability under this section *on aiders and abettors who commit crimes in participation of a criminal street gang.* [Citation.]" (*People v. Garcia, supra,* 28 Cal.4th at p. 1171, italics added.)

"Under this sentencing regime an aider and abettor who is found guilty of murder is subject to the 25 years to life enhancement even though he or she did not personally and intentionally discharge a firearm causing death if the murder was committed for the benefit of a criminal street gang and 'any principal' in the offense personally and intentionally discharged a firearm causing death." (*People v. Hernandez, supra,* 134 Cal.App.4th at p. 480, fn. omitted.)

The imposition of the indeterminate enhancement on a defendant convicted as an aider and abettor to a murder committed for the benefit of a criminal street gang, pursuant to section 12022.53, subdivision (e), does not violate the defendant's equal protection or due process rights, or constitute cruel and/or unusual punishment. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 12-18; *People v. Hernandez, supra,* 134 Cal.App.4th at pp. 480-483.)

We conclude the court properly imposed the consecutive term of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1), and section 654 was not applicable.

(Lodged Doc. 11 at 5-8 (record citations omitted).)

54

## 2. Analysis

### a. Applicability of Section 654

The state court determined that section 654 was inapplicable in Petitioner's case. Petitioner contends this ruling was erroneous. However, the Court is bound by the California Court of Appeal's interpretation of the state penal code. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also Christian v. Rhode, 41 F.3d 461, 469 (1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."). More specifically, a claim in federal court that multiple punishment violates section 654 fails to state a federal question. See Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir.1989) (holding petitioner's claim that the state court violated Penal Code section 654 was not cognizable under AEDPA). The state court's application of state sentencing law is not cognizable on habeas review unless the error is so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

### b. Eighth Amendment

Petitioner makes a cursory claim that his firearm enhancement violates the Eighth Amendment. This claim was not presented to the California Supreme Court and it is therefore unexhausted. (Lodged Doc. 12.) 28 U.S.C. § 2254(b)(1). Regardless, the claim may be denied on the merits because it is not colorable. 28 U.S.C. § 2254(b)(2); Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005).

The United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment. See Harmelin v. Michigan, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring). However, outside the context of capital punishment, successful challenges to the proportionality of particular

sentences are "exceedingly rare." <u>Solem v. Helm</u>, 463 U.S. 277, 289–90 (1983). "The Eighth Amendment forbids only extreme sentences that are 'grossly disproportionate' to the crime." <u>Harmelin</u>, 501 U.S. at 1001 (Kennedy, J., concurring) (citing <u>Solem</u>, 463 U.S. at 288, 303). Thus, in <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003), the United States Supreme Court held that it was not an unreasonable application of clearly established federal law for the California Court of Appeal to affirm a "Three Strikes" sentence of two consecutive 25 year-to-life imprisonment terms for a petty theft with a prior conviction involving theft of $150.00 worth of videotapes. In <u>Ewing v. California</u>, 538 U.S. 11, 29 (2003), the Supreme Court held that a "Three Strikes" sentence of 25 years-to-life in prison imposed on a grand theft conviction involving the theft of three golf clubs from a pro shop was not grossly disproportionate and did not violate the Eighth Amendment. More recently, in <u>Crosby v. Schwartz</u>, 678 F.3d 784, 791–92 (9th Cir.2012), the Ninth Circuit held that a "Three Strikes" sentence of 26 years to life for failure to annually update sex offender registration and failure to timely register a change of address did not violate the Eighth Amendment.

Here, Petitioner was sentenced to an aggregate term of forty years to life for his participation as an aider and abettor in a murder involving the use of a firearm. This sentence does not lead to an inference of gross disproportionality and therefore does not amount to cruel and unusual punishment under the Eighth Amendment.

### c. Insufficient Evidence

Finally, Petitioner argues that the firearm enhancement is not supported by the evidence. This claim likewise was not presented to the California Supreme Court and is unexhausted. (Lodged Doc. 12.) 28 U.S.C. § 254(b)(1). Regardless, it is not colorable. 28 U.S.C. § 2254(b)(2); <u>Cassett</u>, 406 F.3d at 623-24. The argument is premised on Petitioner's contention that he is not subject to the enhancement as an aider and abettor. The Fifth District Court of Appeal's analysis forecloses such a determination on state law grounds.

1    Accordingly, Petitioner is not entitled to relief on this claim.

2    **F.    Claim Six: Failure to Stay Sentence on Gang Enhancement**

3    Petitioner argues that his constitutional rights were violated at resentencing when
4    the trial court stayed the sentence on the gang enhancement pursuant to California
5    Penal Code § 186.22(b)(1)(C) rather than § 186.22(b)(5). (ECF No. 26 at 18.) Petitioner
6    raised this claim in his second appeal to the Fifth District Court of Appeal (Lodged Doc. 7
7    at 13-14), and the Court of Appeal granted Petitioner relief. (Lodged Doc. 11 at 8-9.)
8    Specifically, the Court of Appeal directed that the abstract of judgment be modified to
9    delete the reference to § 186.22(b)(1)(C) and to indicate Petitioner was sentenced
10   pursuant to § 186.22(b)(5) and that the enhancement under that section was stayed.
11   (Id.)

12   Because Petitioner has been granted relief on this claim, it is moot. Bailey v. Del
13   Papa, 237 F. App'x 280, 281 (9th Cir. 2007) (finding adjudication of habeas claim
14   unnecessary where state court had already granted relief). Thus, even assuming the
15   claim is cognizable in a federal habeas proceeding, he is not entitled to relief on this
16   clam.

17   **VI.    Points and Authorities in Support of Traverse**

18   Almost five months after filing his traverse, Petitioner filed a document styled,
19   "Points and Authorities in Support of Traverse." (ECF No. 42.) However, the document
20   does not address arguments raised in the petition or traverse, and instead asserts that
21   Petitioner is entitled to resentencing due to recent changes in California law.

22   This claim is not contained in the petition. Furthermore, it appears to be
23   unexhausted and raises only questions of state law. It is not cognizable on federal
24   habeas review. Petitioner is not entitled to relief on this claim and instead must seek any
25   available remedy in state court.

26

27

28

**VII.     Conclusion and Recommendation**

Based on the foregoing, it is HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __January 10, 2018__          ____/s/ *Michael J. Seng*____
                                              UNITED STATES MAGISTRATE JUDGE